**BAKER & TAYLOR DRILLING CO.,**
Appellant,

v.

**R. W. STAFFORD, Trustee, Appellee.**

No. 20071.

United States Court of Appeals
Ninth Circuit.

Dec. 1, 1966.

Rehearing Denied Feb. 13, 1967.

David M. Garland, of Gregg, Robertson & Garland, Newport Beach, Cal., H. A. Berry, of Underwood, Wilson, Sutton, Heare & Berry, Amarillo, Tex., for appellant.

Ernest R. Utley, Hubert F. Laugharn, of Utley & Houck, Los Angeles, Cal., for appellee.

Before MERRILL and DUNIWAY, Circuit Judges, and TAVARES, District Judge.

TAVARES, District Judge:

Appellee Stafford is the Trustee in reorganization of Tri-State Petroleum, Inc.; Appellant Baker and Taylor Drilling Company has filed a mechanics lien against a Texas gas well in which appellee claims an undivided interest on behalf of Tri-State. J. D. Amend also owns an undivided interest in the gas well in question, which is referred to as the Wilbanks Well, or the Section 2 well.

Baker & Taylor Drilling Company drilled the Wilbanks well and its lien is for approximately $27,000.00 which it claims is due for part of the drilling costs. While the Wilbanks well was being drilled, Baker & Taylor received three $20,000.00 checks from Tri-State, but it applied about $30,000.00 of that $60,000.00 to a pre-existing debt that Tri-State owed Baker & Taylor, as the balance due for drilling costs of a "dry hole" (referred to as the Nusbaum well or Section 54 well). The trustee claims that Baker & Taylor should have applied the full $60,000.00 to the cost of drilling the Wilbanks well.

Baker & Taylor has preserved its objection to the jurisdiction of the Court over the subject matter of the dispute and over Baker & Taylor as a party.

During 1962 Tri-State entered into a series of informal agreements with J. D. Amend regarding the drilling of wells on certain Texas properties controlled by Amend. Generally, each agreement was that Amend would transfer to Tri-State an undivided three-fourths interest in the petroleum lease acquired or to be acquired by him, if Tri-State would pay the drilling cost of the well, plus three-fourths of the cost of completing the well if it was a producer. In each case the drilling costs amounted to about $60,000.00.

In May of 1962 Baker & Taylor contracted with Amend to drill a well, known as the Section 56 well, for a price of $58,000.00. The drilling costs of that well were paid by Tri-State, and since the well was a producer, Tri-State also paid three-fourths of the completion costs, whereupon Amend assigned a three-fourths interest in the lease and the well to Tri-State (and to Tri-State's nominees).

In August, 1962, Baker & Taylor contracted with Tri-State to drill the Nusbaum well, or Section 54 well, for a price of $60,000.00. Tri-State mailed to Amend its check for $30,000.00 payable to Baker & Taylor, and Amend delivered it to Baker & Taylor. That check was returned unpaid by the bank on which it was drawn, but thereafter it did clear when it was redeposited. Tri-State mailed two more checks to Amend, each in the sum of $5,000.00, made payable to Amend, and he endorsed them and delivered them to Baker & Taylor. Some extra work was done on the Nusbaum Well and Baker & Taylor's final bill was about $70,000.00. Since the Nusbaum Well was a dry hole, Tri-State paid no completion costs, and Amend did not assign any interest to Tri-State. Nothing more was paid to Baker & Taylor by Tri-State until drilling was under way for the Wilbanks, or Section 2 well. After the drilling of the Nusbaum dry hole, Tri-State and Amend made a further informal agreement for the drilling of the Wilbanks or Section 2 well. Again Tri-State agreed to pay the drilling costs and three-fourths of the completion costs (if any) in return for an undivided three-fourths interest in the well and its lease.

Amend signed the written drilling contract with Baker & Taylor, dated December 1, 1962, for the drilling of the Wilbanks Well, for $58,000.00 plus a specified amount per day for certain additional work that might be required. Payment was due within thirty days after completion of drilling.

On December 13, Baker & Taylor received by mail a $20,000.00 post-dated check from Tri-State, referred to as check #127. Although that check was dated December 17, by Tri-State, Baker & Taylor deposited it the day it was received, December 13, and it was paid by the bank on which it was drawn, on December 18. Check #127 had no written designation regarding the manner in which it should be applied by Baker & Taylor.

The next $20,000.00 Tri-State check received by Baker & Taylor, check #142, was delivered by Amend on or about December 19. That check bore the notation "On account of Section 2." Amend handed it to Roy Bulls, Secretary of Baker & Taylor, and told him that Tri-State had agreed to pay the $60,000.00 drilling cost of the Wilbanks well, and that if Tri-State failed to do so, Amend wanted to know it; because he was not in a position to pay it himself, and if Tri-State did not pay the drilling cost, he would sell their interest elsewhere. Bulls agreed to tell Amend whether or not Baker & Taylor received the balance of the drilling costs from Tri-State. Drilling of the Wilbanks well, a successful producer, was completed on December 22, 1962.

On December 27 Baker & Taylor received by mail the third $20,000.00 Tri-State check, #156, dated December 20. Bulls then phoned Amend, telling him that Baker & Taylor had received the last of the checks, for a total of $60,-000.00. In fact, however, Baker & Taylor had not credited the full $60,000.00 to the Wilbanks well, but had credited all of check #127, and about one half of check #156, to Tri-State's outstanding indebtedness for the Nusbaum dry hole.

But it was not until May or June of 1963, that Baker & Taylor personnel revealed to Amend and to Tri-State that about half of the $60,000.00 received by Baker & Taylor during December, 1962, had been credited to the account for the Nusbaum dry hole, rather than to the account for the Wilbanks well. On June 17, 1963, Tri-State filed its petition for corporate reorganization. On June 20, 1963, Baker & Taylor recorded a lien against the Wilbanks well for the amount it claimed was due for drilling costs.

■■ Baker & Taylor claims that the court in reorganization lacked personal jurisdiction of Baker & Taylor and lacked jurisdiction of the subject of the dispute. It argues that the trustee should be required to proceed by way of a plenary action and that he had no right to proceed summarily, as he did. Appellant correctly cites the applicable law as follows:

"A bankruptcy court has the power to adjudicate summarily rights and claims to property which is in the actual or constructive possession of the court. Thompson v. Magnolia Petroleum Co., 309 U.S. 478, 481, 60 S.Ct. 628, 629, 84 L.Ed. 876. If the property is not in the court's possession and a third person asserts a *bona fide* claim adverse to the receiver or trustee in bankruptcy, he has the right to have the merits of his claim adjudicated 'in suits of the ordinary character, with the rights and remedies incident thereto.' Galbraith v. Vallely, 256 U.S. 46, 50, 41 S.Ct. 415, 416, 65 L.Ed. 823; Taubel-Scott-Kitzmiller Co. v. Fox, 264 U.S. 426, 44 S.Ct. 396, 68 L.Ed. 770." Cline v. Kaplan, 323 U.S. 97, (1954) 98–99, 65 S.Ct. 155, 156, 89 L.Ed. 97.

The real thrust of appellant's argument is that the lower court did not have possession of the property in question. We do not agree.

It was Amend who had title to the lease, who contracted with Baker & Tay-

lor for the drilling of the Wilbanks well, and who had actual possession of the site as the operator of the well; and it was Amend who submitted himself and the res to the jurisdiction of the court. Amend did not claim adversely to the trustee in bankruptcy, but admitted that he stood ready and willing to transfer to the trustee an undivided three-fourths interest in the lease and the well, whenever the appropriate payments were made. Appellant is a mere lien-holder and, of course, does not claim to be the true owner of the well—it can claim to be no more than a secured creditor.

Although Tri-State's rights were in process of acquisition, and its title had not been perfected, its situation was analogous to that of any purchaser of property whose right to record title depends upon payment of the purchase price in full.

The authorities cited by appellant are not in point. In Taubel-Scott-Kitzmiller Co. v. Fox, 264 U.S. 426, 44 S.Ct. 396, 68 L.Ed. 770, the judgment creditor had levied execution upon certain personal property; a sheriff took possession of it, and then the debtor became bankrupt. The debtor's trustee in bankruptcy did not have possession of the personalty, because the sheriff's possession was that of the creditor. The court states the rule, applicable here, that constructive possession exists in the trustee " * * * where the property is held by some other person who makes no claim to it * * " 264 U.S. at 433, 44 S.Ct. at 399.

In Cline v. Kaplan, 323 U.S. 97, 65 S.Ct. 155, 89 L.Ed. 97, the respondents claimed *ownership* of assets that had been in their possession for fifteen months prior to the bankruptcy. Harrison v. Chamberlin, 271 U.S. 191, 46 S.Ct. 467, 70 L.Ed. 897, is similarly distinguishable: there the money that was the subject of dispute was in the possession of the respondent, not of the trustee in bankruptcy.

In the case of In re Meiselman, 2 Cir., 105 F.2d 995, the respondent had sold certain animal skins to an insolvent person, then repossessed them and attempted rescission of the contract of sale; shortly thereafter the insolvent purchaser became a bankrupt. Thus the personalty was not in the possession of the insolvent when he became a bankrupt.

In re Lake's Laundry recognizes the principal applicable here:

"If the property covered by these conditional sales contracts is property of the debtor, it should not be permitted to be taken out of the reorganization proceedings before the approval of the plan. If it is not such property, the pendency of the reorganization proceedings cannot curtail such rights in respect to it as would otherwise be possessed by the sellers.

"If the appellees had only a lien upon the property, as they would were they mortgagees, it is clear that it would be covered by the reorganization petition. Section 77B includes within its scope property of the debtor on which another has a lien or mortgage." 2 Cir., 79 F.2d 326, 327–328.

Thompson v. Terminal Shares (CCA 8th 1939), 104 F.2d 1, involved personal property that was not in the trustee's possession: the trustee merely sought to enforce an equitable lien as to that personalty.

The holding of In re Standard Gas & Electric Co. (CCA 3rd 1941), 119 F.2d 658, was that a trustee in bankruptcy could not obtain in personam jurisdiction of a party served outside the territorial jurisdiction of the court except in an in rem action, and for the purpose of protecting the res. That case is no help to appellant here, because the action reviewed here was in rem, and was for the purpose of protecting the debtor's res. The Standard Gas and Electric Company case followed the Ninth Circuit case of United States v. Tacoma Oriental S.S. Co. (9 Cir. 1936), 86 F.2d 363, and in-

cludes the following quotation from that opinion:

"Jurisdiction over a person outside the lower court's jurisdiction, is given to the lower court, only if such person is in some manner invading, interfering, or disposing of the debtor's res, and then only to the extent of preventing or forestalling the invasion, interference or disposition of such res. The act gives no jurisdiction to the trial court to issue its process outside its district in proceedings purely in personam, in which no protection of the debtor's res is involved." 86 F.2d at 368.

And the holding of In re Patten Paper Co. (7 Cir. 1936), 86 F.2d 761, 765 was that:

"The District Court had no jurisdiction to restrain state court proceedings to enforce a lien on [stock] that did not belong to the debtor."

Reighard v. Higgins Enterprises (3 Cir. 1937), 90 F.2d 569, is distinguished because there the mortgagee was in possession after default by the debtor:

"However, where the mortgagee is in possession after default, either personally or through custodial receivers appointed by the court, the court of bankruptcy does not have the power to take possession of the mortgaged premises until the default has in some way been cured. * * *" 90 F.2d 570.

In Buss v. Long Island Storage Warehouse Co. (2 Cir. 1933), 64 F.2d 338, the rugs that were the subject of the dispute were never in the possession of the debtor, nor of his trustee in bankruptcy. Judge Learned Hand discussed the principles that applied there, as they do here, in the following terms:

"The power over a bankrupt's estate depends primarily on actual custody, like that of any other court that proceeds in rem. Having taken hold of the property, it may award it to whom it thinks lawful, and other courts will recognize the interests so decreed. However, its power is not limited to goods of which it has actual custody through its officer; a marshal, a receiver, or a trustee. It may also seize summarily other goods, which are in that case said to be 'constructively' in its possession at petition filed. The underlying condition upon this incidental power is that the property must be in the possession of one who acknowledges that he holds it subject to the bankrupt's demand. Such a bailee, making no claim of interest, is subject to the orders of the bankruptcy court as such. Mueller v. Nugent, 184 U.S. 1, 22 S.Ct. 269, 46 L.Ed. 405; Babbitt v. Dutcher, 216 U.S. 102, 30 S.Ct. 372, 54 L.Ed. 402, 17 Ann.Cas. 969; Taubel, etc. Co. v. Fox, 264 U.S. 426, 432, 433, 44 S.Ct. 396, 68 L.Ed. 770." 64 F.2d at 339.

Bay City Shovels, Inc. v. Schueler (6 Cir. 1957), 245 F.2d 73 is distinguished on the ground that it was an ordinary bankruptcy proceeding in which a court of bankruptcy has no power over secured creditors; here, on the contrary, we are considering a corporate reorganization proceeding in which the court has jurisdiction over secured as well as unsecured creditors. An illuminating discussion of this distinction can be found in 6 Collier on Bankruptcy, 14th Edition § 305.

■ When the petition for corporate reorganization was filed in this case, J. D. Amend was in actual possession of the property here in question, and appellee Stafford came into constructive possession of an undivided three-fourths interest, when Amend submitted to the jurisdiction of the court without claiming adversely to Tri-State. It necessarily follows that the lower court had summary jurisdiction to determine the validity of appellant's lien against Tri-State's interest in the Wilbanks well.

■ Appellant also objects to the finding below that Baker & Taylor is estopped to deny that it has been paid

the drilling costs of the Wilbanks well. This court has carefully examined the transcript and the exhibits, and cannot say that the finding complained of was clearly erroneous. There was ample evidence from which the court could conclude, as it did, that Baker & Taylor deliberately misled Amend into believing that the drilling costs of the Wilbanks well had been fully paid; and further, that Amend and Tri-State suffered detriment from being thus misled.

Finally, appellant contends that the lower court exceeded its jurisdiction by restraining Baker & Taylor from proceeding against Amend. The usual rule is concisely stated in 11 Remington on Bankruptcy 1961 Edition § 4370 at pages 65–66:

"The court will not take jurisdiction of collateral disputes between third parties unless their settlement is a necessary step in reorganization."

And see Kaplan v. Guttman (9 Cir. 1954), 217 F.2d 481, 484, in which the court quotes the following from Evarts v. Eloy Gin Corp. (9 Cir. 1953), 204 F.2d 712, 717:

"The Bankruptcy Court has no jurisdiction in controversies between third parties not involving the debtor or his property."

The question, of course, is whether it was necessary for the lower court to restrain Baker & Taylor from proceeding against Amend in order to protect its action taken in connection with the reorganization.

Appellee argues that if Baker & Taylor did obtain a state court judgment against Amend for the drilling costs of the Wilbanks well (a rather unlikely possibility), Amend would be justified in demanding that Tri-State (or its trustee) pay that judgment before delivering title to an undivided three-fourths interest in the well. But that argument overlooks the fact that Amend has submitted to the jurisdiction of the court in reorganization, and that he is bound by its decrees in any event; and further, that such a state court judgment could have no effect on the *debtor's* interest in the Wilbanks well.

There would be no reason to restrain an ordinary creditor of Amend from attaching his interest in the Wilbanks well. Similarly there is no reason for doing so in the case of Baker & Taylor. Undivided fractional interests in mineral leases are readily saleable, and presumably a creditor can reach the interest of an owner of one fractional share without affecting the interests of other owners. There is no reason to put Baker & Taylor in a special class.

If Baker & Taylor were to file suit against Amend in this connection in a state court, it seems highly unlikely that the state court would ignore the fact that Amend and Baker & Taylor had been parties to this proceeding in which virtually the same issues had been litigated. But assuming for the sake of discussion that the state court were to award judgment in favor of Baker & Taylor against Amend, that would simply be one of the "unfortunate circumstances" of going into a business venture with a corporation that goes into reorganization. See In re Magnus Harmonica Corp. (3 Cir. 1956), 237 F.2d 867, 868.

Thus it does not appear that an injunction restraining Baker & Taylor from pursuing Amend is required in aid of the jurisdiction of the court in reorganization, and that portion of the judgment below restraining Baker & Taylor from pursuing Amend is hereby reversed; in all other respects the judgment of the district court is affirmed.